655 P.2d 1001

In the Matter of the ESTATE OF Dana U. LAMB, Deceased;

Maria FELLIN, Petitioner-Appellee,

v.

ESTATE OF Dana U. LAMB, Maria Fellin, Personal Representative, Respondent,

Charles E. Lamb III, Charlotte Lamb Trautman, Hazel A. Pirone, Judith F. Jones, and Gloria E. Gifford, Appellants.

No. 13557.

Supreme Court of New Mexico.

Nov. 1, 1982.

Rehearing Denied Dec. 13, 1982.

William F. Aldridge, Cohen & Aldridge, Albuquerque, for appellants.

Thomas G. Fitch, Socorro, Leslie C. Smith, Truth or Consequences, William L. Lutz, Las Cruces, for petitioner-appellee.

OPINION

PAYNE, Chief Justice.

This appeal is from a judgment entered by the district court in two consolidated actions. The informal probate of the estate of the decedent, Dana U. Lamb, was consolidated by the district court with a petition for payment of claim by Maria Fellin for what amounted to a substantial portion of Lamb's estate. Several individual appellants were allowed to intervene in the latter action. Fellin was awarded the entire estate of the deceased. We reverse.

We discuss two issues:

1. Whether the trial court erred in finding that Lamb and Fellin had entered into a common law marriage, thus entitling Fellin to receive Lamb's estate as decedent's widow.

2. Whether the trial court erred in concluding that, alternatively, Fellin was entitled to Lamb's estate as a matter of equity.

Maria Fellin and Dana Lamb met in New Mexico in April 1975. They quickly became close friends and after about three months, they recorded a conversation in which they dedicated their lives to one another.

The central part of their conversation is set out below:

DAN: So now, let's—tonight, let's make this final decision now. This is it. Do you promise to dedicate your life to me? All right then, I promise to dedicate my life to you. Now, that's a marriage ceremony.

MARIE: Yeah, it is.

DAN: In the eyes of God, we're married.

MARIE: Um-hm.

DAN: Because we've been looking for each other all these years. We've finally found each other and in the eyes of God, we're mates. We can have a formal marriage ceremony, we can take off as we are right now, we can do anything we want to do, whatever our conscience wills. We do whatever we think we should do. Because we're free now. Don't you dare think of going back to earning a salary. We don't need it. We have enough money. I'll show you my financial statement. I think, I don't know, with this inflation, whether we have enough to keep us going the rest of our lives but as a team, what I have is yours, you know? It makes no difference, I don't care. We're not thinking about that, we're thinking about the things we're going to accomplish. So that's final now. Do you agree? This is like taking a marriage vow.

MARIE: Yeah, it is, sort of, isn't it?

DAN: When you dedicate yourself to the other person in the marriage vows, it's the same thing, to love and cherish, in sickness and in health and all the things that confront a person in life and that calls for a complete dedication and that's the fault in our modern society today, there's—we don't have dedication.

There's too much selfishness. There's too much independence. When you're dedicated, independence is there but in a different form because your independence is based on what we want to do, what the team wants to do.

Later that year Lamb and Fellin traveled to Micronesia, where they resided for several months. They returned to New Mexico in 1976.

At trial Fellin testified as follows: "On numerous occasions, we pledged to spend the rest of our lives together. We loved each other dearly and we were devoted to each other and loyal to each other and everything in that original cassette was absolutely the way we felt." Fellin testified that she and Lamb made and reaffirmed these vows in El Paso, Texas, en route to Micronesia, and again while in Micronesia. From 1975 until Lamb's death they held themselves out as husband and wife, often cohabitating. They were known as Mr. and Mrs. Lamb. On returning from Micronesia, they contacted a Catholic priest and started proceedings for church annulment of a previous marriage of Lamb. Fellin testified that it was the wish and desire of both parties to marry, but that Lamb's religious convictions prohibited marriage until he obtained an annulment of his first marriage. She testified that Lamb had promised to marry her as soon as an annulment was granted, and that, "I believe that the tape indicated that there was a marriage ceremony that took place between the two of us and that we were to have a formal marriage before a priest." Lamb died in 1979, shortly before notice arrived announcing the annulment of his previous marriage. At the time of his death, Lamb was seventy-eight years old.

■ The district court found that Fellin and Lamb had entered into a common law marriage as a result of their acts and intentions while they were present in Texas and Micronesia. As common law marriage is not authorized in New Mexico, no common law marriage was formed when Lamb and Fellin tape recorded the original "vows" in

New Mexico in 1975. *In re Gabaldon's Estate,* 38 N.M. 392, 34 P.2d 672 (1934). However, New Mexico will recognize a common law marriage if valid in the jurisdiction where consummated. § 40–1–4, N.M.S.A. 1978; *Gallegos v. Wilkerson,* 79 N.M. 549, 445 P.2d 970 (1968). New Mexico applies the rule of comity, that the law of the place where the marriage is performed governs the validity of that marriage. *Ferret v. Ferret,* 55 N.M. 565, 578–79, 237 P.2d 594, 602 (1951). To determine whether a valid common law marriage was formed in a foreign jurisdiction, it is therefore necessary to look to the substantive law of that jurisdiction.

■ Fellin and Lamb were not citizens of Micronesia. To determine whether they entered into a common law marriage in Micronesia, it is necessary to assess Micronesia's law. Because Micronesia is a United States Trust Territory, it is governed by the Code of the Trust Territory of the Pacific Islands. The Code does not explicitly permit common law marriages, but it does state that common law is adopted "in the absence of written law" governing the territories. 1 TTC § 103 (1980). However, the Code specifically states that in order to make valid a marriage contract between two non-citizens of the Trust Territory, "it shall be necessary that . . . [a] marriage ceremony be performed by a duly authorized person as provided in this chapter." 39 TTC § 51 (1980). The Code then specifies who such a "duly authorized" person may be and sets out requirements for a license of marriage. 39 TTC §§ 53, 54 (1980). There is no allegation that Fellin and Lamb complied with these requirements. Because these requirements are "necessary," Fellin and Lamb could not have been married under the law applicable in Micronesia.

■ Texas, where Fellin and Lamb also visited but never resided, does recognize common law marriage. *See* Tex.Fam.Code Ann. § 1.91 (Vernon 1975); *Humphreys v. Humphreys,* 364 S.W.2d 177 (Tex.1963); 38 Tex.Jur.2d Marriage § 15 (1962 and Supp. 1981). However, Texas law holds that merely spending an occasional night in Tex-

as when the parties are domiciled in a state that does not recognize common law marriage does not give rise to a common law marriage in Texas. *Kelly v. Consolidated Underwriters,* 300 S.W. 981 (Tex.Civ.App. 1927), *aff'd,* 15 S.W.2d 229 (Tex.Com.App. 1929). The threshold question is whether a couple established significant contacts with a jurisdiction recognizing common law marriage. *See In re Estate of Willard,* 93 N.M. 352, 600 P.2d 298 (Ct.App.1979). There is no evidence in the record that Fellin and Lamb established significant contacts in Texas. *Cf. In re Estate of Willard, id.* (finding couple had sufficient significant contacts with State of Texas to establish common law marriage in New Mexico). Moreover, there is no evidence that they ever intended to reside there. As a Texas court held in *Marek v. Flemming,* 192 F.Supp. 528 (S.D.Tex.1961), a trip to Texas does not result in a valid common law marriage when the spouses have no intention of acquiring residence in Texas.

■ Fellin testified that she and Lamb stayed for a day or two at the Hilton Hotel in El Paso, Texas, and that they repeated their vows to each other at that time. This alone is insufficient to establish significant contacts with the State of Texas for purposes of common law marriage. *See Cruickshank v. Cruickshank,* 193 Misc. 366, 82 N.Y.S.2d 522 (1948) (common law marriage not established in Texas by temporary visits or stopovers in that state); *see also Vaughn v. Hufnagel,* 473 S.W.2d 124 (Ky. Ct.App.1971), *cert. denied,* 405 U.S. 1041, 92 S.Ct. 1313, 31 L.Ed.2d 582 (1972) (visit to Ohio insufficient to establish a common law marriage); *Laikola v. Engineered Concrete,* 277 N.W.2d 653 (Minn.1979) (court held that Minnesota residents may not enter into a valid common law marriage by temporarily visiting in a state that allows common law marriages). Other states have made similar rulings. *McGrath v. McGrath,* 387 S.W.2d 239 (Mo.Ct.App.1965); *In re Binger's Estate,* 158 Neb. 444, 63 N.W.2d 784 (1954); *State ex rel. Smith v. Superior Court,* 23 Wash.2d 357, 161 P.2d 188 (1945).

Based on facts similar to those in this case, the New Mexico Court of Appeals, in *Bivians v. Denk,* commented as follows:

> Because of the mobility of modern society, the possibility of fraud arising from claims of common law marriage and the uncertainty which such claims of marriage inject into the affairs of individuals, it is not enough to establish a common law marriage that the parties have together made occasional visits to a jurisdiction that recognizes common law marriages. Nor does an occasional holding out of marriage or mere sexual relationship in a state authorizing common law marriages result in the formulation of a bona fide marriage. *Grant v. Superior Ct. in and for County of Pima,* 27 Ariz. App. 427, 555 P.2d 895 (1976); *Ex parte Threet,* 160 Tex. 482, 333 S.W.2d 361 (1960). If the original relationship of the parties in New Mexico is illicit and the couple continue to maintain legal residence in New Mexico, a common law marriage cannot be inferred absent proof of each element necessary to establish a common law marriage and a showing of substantial contacts by the parties with the state where the alleged common law marriage occurred.

*Bivians v. Denk,* 98 N.M. 722, 652 P.2d 744 (Ct.App.1982), *cert. quashed,* 98 N.M. 762, 652 P.2d 1213 (1982).

The facts of this case do not support a finding that Fellin and Lamb entered into a common law marriage in either Micronesia or Texas.

 The second issue before this Court is whether Fellin was entitled to Lamb's estate as a matter of equity. From the facts in the record, we find no merit to this argument. We are not persuaded that in this case, in the absence of an agreement between the parties, Fellin can expect payment for services rendered while living with Lamb. There is no evidence that Fellin expected to be paid for her services, nor did she prove the value of her services. She is therefore not entitled to Lamb's estate as a matter of equity.

We reverse the trial court and remand for entry of a decision consistent with this opinion.

IT IS SO ORDERED.

FEDERICI and RIORDAN, JJ., concur.