IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-042

Filing Date: November 9, 2011

Docket No. 32,397

IN THE MATTER OF
DENNIS W. MONTOYA,

An Attorney Suspended From The Practice of Law
In The Courts of the State of New Mexico

DISCIPLINARY PROCEEDING

William D. Slease
Joel L. Widman
Albuquerque, NM

for Disciplinary Board

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Charles J. Vigil
Brenda M. Saiz
Theresa W. Parrish
Albuquerque, NM

for Respondent

OPINION

PER CURIAM.

{1}     Almost three years ago, a state district judge initiated a disciplinary complaint against attorney Dennis Montoya alleging numerous, serious ethical violations arising out of Montoya's legal representation of several clients in regard to an accidental death. Over time, that one disciplinary complaint became many, as several federal judges in separate proceedings publically reprimanded Montoya for numerous, well-documented ethical lapses. When considered as a whole, all these complaints set forth a deeply troubling mosaic of ethical misconduct that, for reasons set forth herein, unquestionably calls for discipline and seriously calls into question Montoya's fitness to practice law. For reasons beyond the scope of this Opinion, resolution of these complaints was delayed inexcusably before the Disciplinary Board, which enabled Montoya to claim an appearance of innocence for far too

1

long. As a result, this Court has undertaken substantial revisions to our disciplinary process to ensure that no such delays will reoccur.

**BACKGROUND**

**{2}** In 2010, counsel for the New Mexico Disciplinary Board charged Montoya with seventy-four violations of the Rules of Professional Conduct. Disciplinary counsel consolidated the charges into three disciplinary actions. Eventually, Montoya stipulated to facts and violations charged in each of the three actions. Based on the stipulations, disciplinary counsel and Montoya came to conditional agreements regarding discipline and made a joint motion to consolidate the three disciplinary actions into one. This Court adopted the consolidated agreement with some significant modifications to the proposed discipline that will be discussed later in this Opinion. The following recitation of events and violations derives from facts outlined in the stipulations that support the admissions made in the conditional agreements and reasonable inferences drawn therefrom.

**{3}** We divide this Opinion into three parts: the state cases, the federal cases, and the discipline.

**THE STATE CASES**

**{4}** The first disciplinary action against Montoya derived from several state claims (the state cases) related to a tire failure that killed a New Mexico resident (Decedent). The state cases involved recovery of Decedent's life insurance proceeds, workers' compensation benefits, and wrongful death proceeds. The woman with whom Decedent lived at the time of his death (Girlfriend) retained Montoya for legal representation in the state cases.

**{5}** As a preliminary matter, it is important to understand the relationships between Decedent, Girlfriend, and the two children. Decedent and Girlfriend lived together for a time in Utah. Though they never married, Decedent and Girlfriend held themselves out to be common-law spouses. Girlfriend had a daughter (Girlfriend's Daughter) from a previous relationship who Decedent never adopted. At some point, Decedent, Girlfriend, and Girlfriend's Daughter moved from Utah to reside in New Mexico, where Decedent and Girlfriend had a son (Son). When Decedent died, Son was approximately three years old.

**{6}** During the state cases, Montoya represented not only Girlfriend, but also Girlfriend's Daughter and Son. As we shall discuss, these parties' legal interests were hopelessly conflicted. While it is not clear at exactly what point Montoya knew that Girlfriend was not Decedent's wife, it is clear that Montoya should have known before he recovered funds in any of the state cases.

*Insurance Case*

**{7}** Decedent died intestate and had a life insurance policy that did not list any

2

beneficiaries. In order to convince the life insurance company to allocate proceeds to Girlfriend, Montoya filed an application for Informal Appointment of Personal Representative with the Eleventh Judicial District Court. In that application, he asserted that Decedent died intestate, that Girlfriend was Decedent's wife, and that Girlfriend's Daughter was Decedent's issue. Neither of the latter assertions were true. Based on Montoya's misrepresentations, the district court appointed Girlfriend as the personal representative of Decedent's estate and, without a hearing, issued an order. Portions of that order, prepared by Montoya, declared that Girlfriend was Decedent's wife, that Son and Girlfriend's Daughter were Decedent's minor children, and that Girlfriend was Decedent's "heir-in-law." Only the statement regarding Son was true.

{8}     Montoya's paralegal submitted the court order and an affidavit signed by Girlfriend, each representing to the life insurance company that Decedent and Girlfriend had a common-law marriage pursuant to Utah law. Montoya admits that these documents were submitted for the purpose of establishing Girlfriend's claim to the insurance proceeds. As a result, the life insurance proceeds, $73,806.97, were paid directly to Girlfriend, rather than to Decedent's estate.

{9}     If the life insurance proceeds had been designated to Decedent's estate, rather than to Girlfriend in her individual capacity, the proceeds would have passed according to the New Mexico's intestate succession statute. *See* NMSA 1978, § 45-2-101(A) (1993) ("Any part of a decedent's estate not effectively disposed of by will passes by intestate succession to the decedent's heirs as prescribed in the Uniform Probate Code, except as modified by the decedent's will." (citation omitted)). Under the intestate succession statute, if a decedent has issue but no spouse, the estate will pass to the decedent's descendants. NMSA 1978, § 45-2-103 (1993) (amended 2011); *see also* NMSA 1978, § 45-2-102 (1975) ("Share of the spouse." (emphasis omitted)). Thus, Son was Decedent's only statutory beneficiary.

{10}    Rather than setting aside proceeds for Son through Decedent's estate, Girlfriend received the entire amount in her individual capacity. Girlfriend then paid $25,000 of that amount directly to Montoya for payment of costs of litigation of the state cases. Some unquantified and unaccounted for portion of the remaining $48,806.97 was used for Son's clothing, education, and basic needs. Girlfriend never accounted for any of the $48,806.97.

*Workers' Compensation Case*

{11}    Montoya filed a workers' compensation claim for the "Estate of [Decedent]," which named Girlfriend as both Decedent's personal representative and wife and named Girlfriend's Daughter and Son as Decedent's children. The Workers' Compensation Act "*only*" permits persons prescribed as dependents therein to receive compensation benefits. NMSA 1978, § 52-1-17 (1989). The only persons prescribed are dependent children of certain ages, widows or widowers, dependent parents, and dependant grandchildren. *See id.* Montoya never advised the Workers' Compensation Administration that Girlfriend's Daughter was not Decedent's child.

3

**{12}** Montoya's representation in the workers' compensation case resulted in a lump-sum workers' compensation settlement of $55,000. From that amount, Montoya distributed $23,135.25 directly to Girlfriend in her individual capacity. No part of the settlement was set aside for Son or paid to Decedent's estate. Montoya apparently retained the remainder of the settlement, $31,864.75, for costs and fees.

### Wrongful Death Cases

**{13}** Montoya also brought a lawsuit against the tire manufacturer and tire vendor that made and sold the tire that failed during the accident that caused Decedent's death. He brought the suit on behalf of the Wrongful Death Estate of the Decedent and on behalf of Girlfriend, Son, and Girlfriend's Daughter for individual loss-of-consortium claims. The Wrongful Death Act provides that proceeds from a judgment shall be distributed entirely to a decedent's child, if there is a child and no "surviving spouse." NMSA 1978, § 41-2-3(A), (B) (2001). The complaint and the amended complaint signed by Montoya specifically alleged that Girlfriend was Decedent's lawful wife. In the course of the lawsuit, Montoya made representations about Decedent's "wife and two children." The pleadings never advised the court that Girlfriend's Daughter was not Decedent's child or that Montoya was relying on any theory of Girlfriend being a common-law wife under Utah law.

**{14}** Montoya settled the wrongful death claim against the tire vendor for a substantial sum. Montoya retained approximately $22,250 of the total amount under a 33.33% contingency agreement. The remainder, $45,000, was distributed entirely to Girlfriend in her individual capacity; none of that amount went to Decedent's estate or Son. It is stipulated that a portion of the proceeds, unquantified and unaccounted for, was used for the clothing, education, and basic needs of Son.

**{15}** Subsequently, Montoya negotiated a settlement of the claim against the tire manufacturer for $550,000. He initially proposed allocating $450,000 of that amount to Girlfriend and $100,000 to Son. This settlement was the first for which Montoya sought court approval. From the total $550,000, Montoya initially planned to receive 40% as a contingency fee, but eventually lowered that amount. The settlement proposal was brought before District Judge Linda Vanzi, who appointed a guardian ad litem (GAL) to represent Son's interests. GAL began to investigate the proposed settlement and to question the previous settlements (life insurance, workers' compensation, and the wrongful death claim against the tire vendor) from which no money had been specifically set aside for Son.

**{16}** Although Montoya had consistently represented Girlfriend as Decedent's wife in his wrongful death pleadings, he later represented to GAL that he was not relying on marital status for Girlfriend's recovery. Rather, he claimed that Girlfriend was entitled to the settlement amount solely due to a loss-of-consortium claim under *Lozoya v. Sanchez*, 2003-NMSC-009, 133 N.M. 579, 66 P.3d 948, *abrogated by Heath v. La Mariana Apartments*, 2008-NMSC-017, 143 N.M. 657, 180 P.3d 664. *Lozoya* stands for the proposition that persons who are *unmarried*, in addition to married persons, may have a loss-

4

of-consortium claim under certain circumstances. It states that "if a couple were to satisfy the elements of a common law marriage, as it exists in other states, this would be a great indication that the couple would have a significant enough relationship to warrant a claim for loss of consortium." *Id.* ¶ 24. Montoya did not attempt to plead facts to prove that Decedent and Girlfriend's relationship would "satisfy the elements of a common law marriage." *Id.* Rather, he simply asserted that Girlfriend was Decedent's wife, a relationship for which we recognized recovery for loss of consortium before deciding *Lozoya*. *See Romero v. Byers*, 117 N.M. 422, 424, 872 P.2d 840, 842 (1994) (holding that New Mexico should recognize a claim for spousal loss of consortium).

**{17}**     Eventually, GAL alerted Judge Vanzi to potential problems and ethical violations with regard to the proposed wrongful death settlement with the tire manufacturer. Judge Vanzi ordered an investigation which uncovered many of the ethical violations discussed herein related to the state cases. Based on what she learned, Judge Vanzi filed detailed allegations with the Disciplinary Board regarding Montoya's conduct. We are grateful to her for doing so. Those allegations, eventually joined with others filed with the Disciplinary Board, led to the consolidated conditional agreement and ultimately to this Opinion.

**{18}**     The fact that Montoya egregiously violated numerous rules of professional conduct in the course of representing the state cases is obvious. We now review those rules in detail.

### *Duty of Candor*

**{19}**     Montoya repeatedly violated his duty of candor to the court. The integrity of the adjudicative process requires that a lawyer act truthfully and honestly before the court. Montoya violated Rule 16-303(A)(1) NMRA by knowingly making false statements of fact and law to a tribunal (e.g., the district court) and to GAL who was acting as an arm of the court. Rule 16-303(D) provides that lawyers must also be forthcoming with all material facts known so that the court may make informed decisions. Montoya also failed in an ex parte proceeding—the application for appointment of Girlfriend as Decedent's personal representative—to inform the district court of all material facts known to Montoya that would enable the court to make an informed decision. Montoya thus violated Rule 16-303(D), which provides that lawyers must be forthcoming with all known material facts so that the court may make informed decisions.

**{20}**     In regard to Montoya's apparent understanding at certain points during the state cases that Girlfriend may have been Decedent's common-law wife under Utah law, the theory was unfounded on several grounds. First, it is well known that, unlike certain jurisdictions, New Mexico does not recognize common-law marriages. *See Hartford Ins. Co. v. Cline*, 2006-NMSC-033, ¶ 13, 140 N.M. 16, 136 P.3d 176. As an exception, New Mexico does recognize common-law marriages that are valid in the jurisdiction where the marriage was consummated. *See In re Estate of Lamb*, 99 N.M. 157, 159, 655 P.2d 1001, 1003 (1982). In order to make Girlfriend's marriage valid, however, Montoya agrees that he needed to establish the marriage in Utah, under the terms of a Utah statute, Utah Code Ann. § 30-1-

4.5(2) (West 2011).

**{21}** Montoya could have moved to establish the marriage for up to a year after Decedent's death, *id.*, but he neglected to take those steps. Without doing so, even Utah would not have recognized Girlfriend and Decedent as married. *Id.* If he had done so, Utah may or may not have recognized the relationship because the state requires evidence that Decedent had consented to the union. "[The statute on legalizing a common-law marriage] requires general reputation, cohabitation, and assumption of marital obligations as separate elements in addition to consent." *Whyte v. Blair*, 885 P.2d 791, 795 (Utah 1994). The Utah Supreme Court has cautioned that

> [c]are must be given to guard against fraudulent marriage claims, especially where a declaration of marriage would reap financial rewards for an alleged spouse. When a reward is available, human nature may choose to strengthen and augment, in retrospect, the consent to marry that was only tentative before the reward became available.

*Id.* (internal citations omitted). Regardless of the merits of such a theory, Montoya represented that Girlfriend and Decedent were lawfully married, without mention of the common-law theory, in all of his court documents.

**{22}** In addition to dishonesty to the Court, Montoya's lack of candor to others caused him to violate additional rules. He violated Rule 16-401(A) NMRA, by making a false statement to a third party (the life insurance company) in connection with the life insurance proceeds. He also violated Rule 16-401(B), by failing to disclose a material fact to a third party when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client. He did so when his paralegal represented to the insurer that Girlfriend was the wife of Decedent under Utah law and submitted her affidavit to that effect.

**{23}** Moreover, if sufficient, a failure of candor to the court can prejudice the administration of justice in violation of Rule 16-804(D) NMRA. Montoya's conduct reached that level because his misconduct left the only lawful beneficiary in the state cases, Son, without protection of his legal interests.

### *Conflicts of Interest*

**{24}** A concurrent conflict of interest exists if there is a significant risk that the representation of one client will be directly adverse to another client or will be materially limited by the lawyer's responsibilities to another client. Rule 16-107(A) NMRA. Montoya had a duty to his clients to avoid a conflict of interest. *Id.* Montoya violated Rule 16-107(A)(1) by representing the substantially adverse interests of Girlfriend, Son, and Girfriend's Daughter. He violated Rule 16-107(A)(2) by representing a client when the representation was materially limited by the attorney's responsibilities to another client or third party. Montoya's representation of Girlfriend and Son created a particularly egregious,

6

concurrent conflict of interest because the legal status of Girlfriend affected the amount of money available to Son. A competent lawyer would realize that, because of the conflict, one attorney could not represent them both.

**{25}** To illustrate, it was in Girlfriend's best interest that she be considered Decedent's wife. If Girlfriend were not the wife, she was limited to an individual claim for loss of consortium. Because Decedent and Girlfriend were never married, nor recognized as married in another state, Girlfriend was not statutorily entitled to recover from any of the state cases. Conversely, it was in Son's best interest that Girlfriend *not* be considered Decedent's wife. He was entitled to recover in *all* the state cases. If Girlfriend were not Decedent's wife, Son was the sole statutory intestate beneficiary, workers' compensation beneficiary, and wrongful death beneficiary. Despite Son's superior legal standing, however, he recovered far less than the amount to which he was entitled. For the most part, the two parties were in conflict over the same proceeds, a "zero sum game," in which the interest of one party necessarily diminished the interests of the other.

**{26}** The concurrent conflict of interest was not just theoretical. It caused a significantly disparate and unjust outcome in this case. The combination of life insurance proceeds, workers' compensation settlement, and the first wrongful death settlement against the tire seller totaled $226,290.80. None of that sum was specifically set aside for Son, and none of it was distributed through Decedent's estate. Then, Montoya proposed a particularly egregious distribution in the second wrongful death settlement, based on the false representation that Girlfriend was Decedent's wife. Even if that representation had been true, Girlfriend's wrongful death entitlement as a spouse would have been limited to one-half. *See* NMSA 1978, § 41-2-3(B) (2001). Even with a nominal claim for loss of consortium, Girlfriend's legitimate claim to settlement proceeds could not have approached $450,000 of the available $550,000, the settlement that was put forward by Montoya.

**{27}** Montoya violated Rule 16-108(G) NMRA, by making aggregate settlements of the claims of Girlfriend and Son (and purportedly for Girlfriend's Daughter) without obtaining the written consent of each client after consultation (or court approval for the minor client). While Montoya may have obtained Girlfriend's consent, he failed to meet his obligation to Son, who was only three years old when Montoya was retained for representation. Because Montoya could not adequately represent Son's interests while simultaneously representing Girlfriend, he should have sought the appointment of a GAL or a conservator to take action to protect Son. *See* Rule 16-114(B) NMRA. By failing to seek the appointment of a GAL or a conservator, or take other protective action for Son in the negotiation and distribution of settlement proceeds, Montoya violated Rule 16-114(B).

*Competence*

**{28}** In addition to his failed duty of candor to the court and conflicts of interest, Montoya failed to provide competent representation. *See* Rule 16-101 NMRA. Montoya failed to competently represent both Girlfriend and Son. In regard to Girlfriend, he failed to take

appropriate steps to establish a common-law marriage between Girlfriend and Decedent under the terms of the Utah statute. In regard to Son, Montoya's competency failures were numerous. He failed to properly distribute settlement proceeds, ignoring statutes that mandated certain distributions. He failed to seek court approval of settlements which should have benefitted Son. And, he failed to protect funds that were rightfully Son's.

{29} Aside from conflicts-of-interest violations, Girlfriend, as Son's mother, may legally have been able to represent Son if that representation was for the purpose of distributing proceeds to him. *See Chisholm v. Rueckhaus*, 1997-NMCA-112, ¶ 5, 124 N.M. 255, 948 P.2d 707 (stating that a parent can be a party to a child's suit by representing the child's interests). Montoya had a reasonable duty of care, however, to ensure that Son's interests as a statutory beneficiary were protected—that Son received any proceeds obtained. *See Leyba v. Whitley*, 120 N.M. 768, 770, 907 P.2d 172, 174 (1995). Montoya did not fulfill this reasonable duty of care, nor is there any indication that Girlfriend was intended to be a legal representative for Son. Although it was stipulated that some portion of the proceeds, unidentified and unaccounted for, was used (presumably by Girlfriend) for Son's clothing, education, and basic needs, all settlement proceeds, before Judge Vanzi's intervention, were paid directly to Girlfriend, in her individual capacity, without any supervision and without any accounting.

{30} Even in light of a legal possibility of representation, the facts in this case suggest that Girlfriend should not have been trusted to represent Son. Before he recovered any settlement amounts, Montoya knew that Girlfriend was using illegal drugs and that she had been charged with felony possession of drugs, specifically methamphetamine. Drug possession and use may be relevant to a parent's ability to care for a child. *See generally State ex rel. CYFD v. Amanda H.*, 2007-NMCA-029, ¶¶ 26-27, 141 N.M. 299, 154 P.3d 674. This Court finds it inexcusable that Montoya would distribute settlement proceeds—rightfully belonging to Son—to Girlfriend, unsupervised and unaccounted for, when Montoya was aware of her use of illegal drugs.

### *Staff Supervision*

{31} In order to protect the public against unqualified persons rendering legal services, only those who have passed the bar may practice law. *See* Rule 16-505 NMRA, ABA Comment [2]. This rule does not limit a lawyer's ability to hire paralegals, as long as a lawyer supervises the delegated tasks and assumes responsibility for their actions. *See* Rule 16-505, ABA Comment [2]. Montoya did not stipulate to the facts relating to his paralegal's unauthorized practice of law (namely, the paralegal's representation to the insurance company the legal significance of certain facts). Despite this, he did not contest the conclusion that he violated Rule 16-503(B) NMRA by failing to make reasonable efforts to ensure that his paralegal's conduct was compatible with the Rules of Professional Conduct. He also admitted to violating Rule 16-503(C) by ordering or, with knowledge of the specific conduct, ratifying the conduct of his paralegal, and Rule 16-505(A), by assisting another person to engage in the unauthorized practice of law.

8

**THE FEDERAL CASES**

**{32}** The second and third disciplinary actions against Montoya arose out of six federal lawsuits (the federal cases). While it is rare for even one federal judge to single out and publically admonish an attorney, several federal judges found it necessary to reprimand Montoya. In the federal cases, like the state cases, Montoya failed to fulfil his duty of candor to the court and to adequately supervise his staff. In addition, he filed frivolous claims and ignored deadlines. Unlike the state cases, which were unified by their underlying facts, the federal cases are unified by patterns of behavior, arising from different factual scenarios. For that reason, we address Montoya's violations in the federal cases by the type of violation rather than by the case.

### *Candor to Court*

**{33}** As we mentioned in our discussion of the state cases, the integrity of the adjudicative process requires that a lawyer act truthfully and honestly before the court. In observation of this duty, a lawyer shall not knowingly make false statements of fact or law. *See* Rule 16-303(A)(1) NMRA. As with the state cases, Montoya failed to meet his duty of candor in the federal cases. As an example of an infraction that represents the tip of the iceberg, Montoya violated Rule 16-303 when he titled a motion that he knew was opposed—he noted the opposition in the body of his motion—as "unopposed."

**{34}** In another case, Montoya filed a complaint under the Age Discrimination in Employment Act (ADEA) that was assigned to U.S. District Judge Judith C. Herrera. ADEA protects individuals over the age of 40 from certain discriminatory employment practices. Montoya alleged that his client was over the age of 40. During discovery, however, his client admitted that she was only 35 at the time of her termination. Opposing counsel notified Montoya of the significance of that age, a jurisdictional fact, but Montoya refused to dismiss the case.

**{35}** Rule 16-303(A) provides that lawyers must "correct a false statement of material fact or law previously made to the tribunal by the lawyer." Once Montoya knew the age of his client and that her case lacked merit, he should have notified the court. By failing to do so, he violated Rule 16-303. Whether Montoya knew the age of his client, and therefore that the ADEA claim was frivolous when filed, is unclear. It is clear, however, that he should have investigated his client's age before filing the lawsuit.

**{36}** If sufficient, a failure of candor to the court can prejudice the administration of justice in violation of Rule 16-804(D) NMRA. It appears Judge Herrera concluded, and we agree, that Montoya's failure prejudiced the administration of justice. She granted summary judgment to the federal employer and dismissed the ADEA action with prejudice. Citing Rule 11(b) of the Federal Rules of Evidence, Judge Herrera gave Montoya the benefit of the doubt that his initial allegation about his client's age was made in good faith. However, the judge asked, rhetorically, "why no effort appear[ed] to have been made to drop the claim

following the revelation of Plaintiff's actual age. Not only did [Montoya] not file an amended complaint dropping the claim, but [he] did not renounce the claim in [the] Response to Defendant's Motion for Summary Judgment . . . ."

**{37}** In the same ADEA case, Montoya failed to meet his duty of candor to the court in yet another way, when he altered deposition testimony to favor his client. The client was a postal worker who had lost an "Arrow Key" while delivering mail and did not report its loss. A supervisor had testified regarding the importance of the key, a type of master key for mailboxes in Albuquerque. The supervisor specifically referenced the loss of the Arrow Key as a reason for termination. While the supervisor's original testimony supported the contention that the key opened *all* mailboxes in Albuquerque, Montoya filed a motion with the supervisor's testimony redacted to read that the key only opened mailboxes in specific areas of Albuquerque. Judge Herrera chastised Montoya for this behavior: "[Montoya's] use of an altered quotation that changes the substance of [the] statement as a basis for challenging a material fact is disturbingly misleading at best."

**{38}** In yet another case, Montoya failed to meet his duty of candor to the court by violating Rule 16-802(A) NMRA, which prohibits making reckless statements about the integrity of a judge. In that case, U.S. District Judge William P. Johnson awarded attorney's fees against Montoya, and Montoya filed an order to recuse the judge, accusing Judge Johnson of having a personal bias against him. Montoya claimed that the basis for his accusations was that Judge Johnson had ruled against Montoya in previous cases, criticized Montoya's legal representation earlier in this same case, which, as discussed below, was more than justified, and obtained Montoya's exclusion from the Criminal Justice Act (CJA) panel through the Judge's limited role in that decision, thereby making Montoya ineligible to be appointed to represent criminal defendants in criminal court.

**{39}** We have reminded attorneys before that "[p]ersonal bias cannot be inferred from an adverse ruling or the enforcement of the rules of criminal procedure." *State v. Hernandez*, 115 N.M. 6, 20, 846 P.2d 312, 326 (1993). Montoya did not explain why Judge Johnson's prior adverse rulings and criticisms were not justified. Further, Judge Johnson just happened to be one of seven New Mexico federal judges who had signed the order excluding Montoya from the CJA panel.

### *Frivolous Litigation*

**{40}** Montoya had a duty to use legal process to effectively advocate for his clients without abusing that process. Included in this obligation is a duty not to bring or defend legally or factually frivolous proceedings. Rule 16-301 NMRA. Montoya brought many frivolous claims and filed many frivolous motions in the federal courts in violation of Rule 16-301.

**{41}** To begin, in Montoya's groundless age discrimination claim, even when the dispositive fact that his client was too young was plainly put before Montoya, he ignored it

10

and continued litigating until he reached both the inevitable result and a written reprimand from a federal judge. If the lawsuit was not frivolous when it was filed, it certainly became frivolous when Montoya was alerted to the age discrepancy and failed to take action to dismiss the lawsuit.

**{42}** In another case, Montoya filed two complaints, one of which was frivolous because its legal basis was precluded by the other. First, he filed a "mixed-case" complaint with the federal Merit System Protection Board (MSPB), meaning that Montoya claimed that an agency personnel action was based in whole or part on discrimination in terms of race, sex, or age. Three days later, he filed a complaint with the Equal Employment Opportunities Commission (EEOC), alleging the same facts. Filing the mixed-case complaint with the MSPB, however, constituted an election of remedy to the exclusion of an EEOC complaint. *Williams v. Munoz*, 106 F. Supp. 2d 40, 43 (D.D.C. 2000) (stating that "[a] mixed-case complaint may be filed with [the EEOC] or with the MSPB, but not in both places at once" (citing 5 U.S.C. § 7702 (2007); 29 C.F.R. § 1614.302(b) (2010))). Thus, the EEOC claim had no effect, or possible effect, whatsoever. The EEOC claim was frivolous.

**{43}** Then, despite the law on mixed-case complaints, Montoya opposed a summary judgment motion on the basis that the ongoing EEOC complaint *justified* continuing the MSPB case. That motion in opposition was frivolous because it had no legal basis. The federal court granted summary judgment based on Montoya's untimeliness in the MSPB case, calling the EEOC claim a legal "nullity."

**{44}** Yet another federal claim made by Montoya was frivolous because it lacked proper defendants and supporting evidence. Montoya listed eight "unidentified" defendants but failed to name or serve them, despite ample opportunity to do so. The one defendant Montoya did name was a sheriff's department. The sheriff's department, however, was not a proper defendant because a prior ruling had held that governmental subunits were not proper defendants. Because Montoya also failed to put forth any evidence in support of some of the claims he made, the claims were dismissed.

**{45}** In a case that highlights Montoya's repeated frivolous filings, Montoya represented a civil defendant in a lawsuit filed in Arizona state court. Montoya improperly removed the case from the Arizona *state* court to the *federal* district court for the District of New Mexico. Instead of attempting to improperly remove the action across state lines, Montoya could have removed the case to Arizona federal court, *see* 28 U.S.C. § 1441(a) (2006), and then filed a motion to transfer to New Mexico federal court, *see* 28 U.S.C. § 1404(a) (2006). Opposing counsel sent a letter to Montoya correctly advising him that the removal was improper because the case could only be removed to a federal district court in *Arizona*. Montoya never withdrew the removal or responded to the letter. Opposing counsel in New Mexico was then forced to file a motion to remand. Montoya argued *forum non conveniens* in response, which had no basis in law or fact.

**{46}** Because neither filing had any legal merit, Montoya's removal and *forum non*

11

*conveniens* claims were both frivolous, in violation of Rule 16-301. In addition, the claims delayed the litigation unnecessarily, in violation of Rule 16-302 NMRA. In ruling on opposing counsel's motion for remand to Arizona, federal Judge Johnson stated, not surprisingly, that the removal petition was deficient on its face and that Montoya's arguments were "totally devoid of merit." Judge Johnson also described Montoya's removal as "blatantly improper," questioning why Montoya had insisted "that removal was somehow proper" despite opposing counsel's efforts "to demonstrate to [Montoya] just how legally unsound and untenable his removal" attempt was. In addition to admonishing Montoya, Judge Johnson awarded attorney's fees against him.

### *Untimeliness*

{47}    Montoya chronically failed to meet court deadlines, thereby impeding the administration of justice. A client is entitled to expect that an attorney will take reasonably prompt action. *In re Carrasco*, 106 N.M. 294, 295, 742 P.2d 506, 507 (1987). Dilatory practices, such as a consistent failure to expedite litigation, discredit the administration of justice. *See* Rule 16-302, Committee Commentary. Therefore, a lawyer shall make reasonable efforts to expedite litigation in accordance with clients' interests. Rule 16-302. Failure to expedite litigation not only discredits the administration of justice, but the passage of time can also adversely affect a client's interests. Rule 16-103 NMRA, Committee Commentary, para. 3. Thus, a lawyer must act with reasonable diligence and promptness in representing a client. Rule 16-103.

{48}    In at least four federal cases, Montoya failed to file essential pleadings on behalf of his clients. The fact patterns are strikingly similar in all four cases, illustrating a disturbing trend of representation without diligence or promptness. Montoya's repeated failure to file, or to timely file, pleadings represents a failure to act with reasonable diligence and promptness in representing his clients in violation of Rule 16-103. In one case, Montoya's client had seven days to file an appeal of his removal from the U.S. Air Force. Montoya waited forty-two days after the deadline to file the appeal. Montoya then had thirty days to appeal to the federal district court which he did not file until ninety-four days after that deadline.

{49}    Failing to file and filing late seemed to have become a matter of course for Montoya. In one case, Montoya had a thirty-day window for initiating review of his client's termination by the U.S. Department of Agriculture. Twenty-nine days *after* the deadline had passed, Montoya filed the complaint. In another instance, Montoya failed to timely respond to a motion for summary judgment. Summary judgment was granted against that client, in part due to Montoya's failure to timely respond. In yet another case, Montoya failed to put forth evidence in support of his allegations, which provoked the court to accept an opposing party's facts, undisputed, and to dismiss those claims.

{50}    Montoya's failure to act in a timely manner repeatedly prejudiced the administration of justice. For example, when federal Judge Johnson awarded attorney's fees against

12

Montoya, the court allowed Montoya ten days to object. Three *months* later, Montoya finally objected. In another federal case, an opposing counsel sought attorney's fees from Montoya's client. Montoya initially obtained an agreement from opposing counsel for an extension to respond, but then failed to file that extension with the court. He then obtained a second continuance with the consent of opposing counsel. When Montoya requested a third continuance, opposing counsel did not consent. When Montoya's opposition to the motion for attorney's fees was finally filed, despite the numerous extensions, it was late and without leave from the court.

**{51}** In the same federal case, Montoya failed to timely respond to opposing counsel's motion for summary judgment. Instead, without leave of the court, he filed an untimely motion for an extension to respond. Then, Montoya filed another untimely response, again without leave of the court, opposing counsel's motion for summary judgment. Montoya also filed an untimely appendix of exhibits to his already untimely response. These repeated delays and requests for continuances represent Montoya's failure to make reasonable efforts to expedite litigation, consistent with the interests of a client, in violation of Rule 16-302.

**{52}** Montoya's untimeliness and lack of diligence provoked U.S. Chief Magistrate Lorenzo F. Garcia to recommend sanctions against Montoya in response to the "needlessly prolonged and increased . . . costs of the litigation." U.S. District Judge James A. Parker adopted Judge Garcia's recommendation, finding that Montoya "brought federal discrimination claims that had no basis, engaged in dilatory tactics, and continued to assert meritless claims long after it became clear that the claims had no basis." Montoya's untimeliness in another federal case caused U.S. District Judge Bruce D. Black to hold Montoya's client responsible for Montoya's "errors that fall short of due diligence."

### Supervision of Staff

**{53}** As with the state cases, in which Montoya failed to supervise his paralegal, he also failed to supervise his office staff, in violation of Rule 16-503 and Rule 16-505. Montoya blamed his staff for his inability to meet court deadlines. This misplaced blame demonstrates Montoya's ignorance of his own professional responsibility to make reasonable efforts to oversee his staff's conduct and ensure compatibility with professional obligations. *See* Rule 16-503(B). Our rules provide that a lawyer acting in a managerial capacity must take measures to reasonably assure that the staff's conduct is compatible with the lawyer's own professional obligations. *See* Rule 16-503(A). Moreover, the lawyer, not office staff, is ultimately responsible for the knowledgeable and diligent representation of clients. *See In re Martinez*, 107 N.M. 171, 172, 754 P.2d 842, 843 (1988) (finding the actions of a legal assistant to be imputed to the actions of the attorney). The reoccurring inability of Montoya's staff to calendar deadlines and otherwise comply with Montoya's professional obligations represents a failure on Montoya's behalf. He has the responsibility to oversee his staff's conduct and ensure that their work was compatible with his own professional obligations. *See* Rule 16-503, Committee Commentary.

13

**{54}** Blaming his staff for his own failure to meet court deadlines is an example of Montoya's alarming pattern of shirking his own responsibilities. This pattern is particularly disconcerting in terms of whether Montoya can ever be trusted to practice law in the future.

**DISCIPLINE**

**{55}** As mentioned at the opening of this Opinion, disciplinary counsel and Montoya came to a conditional agreement regarding discipline after consolidating the state and federal cases. This agreement formed after Montoya conceded the various facts and violations described herein and after he waived the right to a hearing before a hearing committee and the Disciplinary Board.

**{56}** Upon initial review, this Court could not agree on several of the terms in the initial consolidated agreement signed by Montoya and disciplinary counsel; the severity and number of Montoya's violations warranted a harsher penalty. The initial consolidated agreement provided for a one-year suspension—six months for the state cases and six months for the federal cases. It also provided for an automatic reinstatement of Montoya's license. Following reinstatement, the agreement provided for a one-year probationary period. Because this Court must ensure that our expectations for Montoya's period of suspension are fulfilled before allowing him to practice again, we could not agree to an automatic reinstatement of his license. In addition, we insisted that the probationary period must be long enough so that, if Montoya does resume the practice of law, he does so responsibly and in accordance with the Rules of Professional Conduct.

**{57}** The agreement was amended to address our concerns. It now provides that if Montoya desires to reinstate his license after his one-year suspension, he must petition this Court for reinstatement as provided under Rule 17-214 NMRA. Montoya's suspension began April 25, 2011. In addition, the probationary period is now three years rather than one. As a condition of the agreement, Montoya was required to pay the costs incurred during the disciplinary matter within ninety days. Any unpaid balance is subject to an 8.5% interest rate per annum.

**{58}** During Montoya's suspension, he may not provide any legal services, including paralegal services, in connection with cases in which any of his present or former clients are or were involved. He cannot work in, out of, or for the same office where his former clients' cases are handled. If he does provide paralegal services, he must do so under the direct supervision of a lawyer approved by this Court who is not representing any of Montoya's former clients. Such an attorney must notify the Office of Disciplinary Counsel that the attorney is retaining Montoya and that the attorney will act as a supervisor.

**{59}** If Montoya is reinstated after a year, he will be on supervised probation, under the supervision of a lawyer approved by this Court. This Court will approve a supervising attorney and Montoya will be obligated to compensate the supervising attorney for time spent providing supervision. Montoya and the supervising attorney will be required to meet

14

no less than once per month. Montoya will be required to accept instruction and direction from his supervisor, including directives related to the handling of trust accounts, maintenance of records, files and calendars, management methods, and caseload. Montoya will have to limit his caseload as determined prudent by his supervisor. The supervisor will submit quarterly reports to disciplinary counsel and thirty days before the end of the probationary period will report whether Montoya has satisfactorily complied with the terms of his probation.

**{60}** The *ABA Standards for Imposing Lawyer Sanctions* (2005) (*ABA Standards*) provide that sanctions should be applied based on a consideration of the ethical duty a lawyer has violated (duty to client, duty to public, duty to legal system, and duty to profession), the lawyer's mental state (intentional, knowing, or negligent), the extent of the actual or potential injury caused by the lawyer's misconduct, and aggravating or mitigating circumstances. *ABA Standards* Rule II, at 9. All these considerations played into Montoya's prescribed discipline. The earlier portion of this Opinion summarizes Montoya's numerous professional conduct violations. We now turn to the other factors: mental state, actual and potential injury, and mitigating factors. In addition, it is important that the discipline in this case be congruent and proportional to discipline applied in other, similarly situated cases.

**{61}** In regard to mental state, some of Montoya's infractions were at least knowing, while for others we have no evidence that they were more than negligent. In the state cases, disciplinary counsel has represented that there is no evidence that Montoya's actions were intended to defraud either his clients or GAL. Some of Montoya's violations, such as candor to the court, must have been knowing by their very nature.

**{62}** In terms of injury, Montoya caused injury or potential injury to his clients, to the legal system, and to the profession. In the state cases, Montoya's actions primarily caused financial injury to Son and general injury to the legal system. There is some evidence of restitution by Montoya to Son, the financially injured party in the state cases. A legal malpractice lawsuit on behalf of Son resulted in a confidential financial settlement, which GAL believes is in an amount that would make Son whole. Thus, the remaining injury in the state cases was to the administration of justice, in that Montoya lied to the courts, wasted the court's time, made a mockery of the legal system, and required GAL to investigate his conduct. In the federal cases, Montoya primarily caused injury to the administration of justice by making late filings, frivolous filings, and misrepresentations to the court. He also potentially injured clients. Although it is not clear if any of the clients in the federal cases had meritorious claims, at a minimum, their injuries were the time and any resources lost by hiring Montoya.

**{63}** Absent aggravating or mitigating circumstances, the *ABA Standards* generally recommend reprimand or, at most, suspension for negligent conduct. *See generally ABA Standards* §§ 4.13, 4.23, 4.33, 4.42(b), 4.43, 4.53(b), 4.63, 6.13, 6.23, 6.33, 7.3, 8.3(a), at 17-25. In regard to conflicts of interest, suspension is appropriate if the lawyer knows of the conflict, does not disclose the possible effect of the conflict, and causes injury to a client.

Reprimand is appropriate if the lawyer is negligent in determining conflicts of interest and causes injury to a client. *Id.* § 4.33, at 18. Disbarment for creating a conflict of interest is only recommended in three circumstances. It is recommended when the conflict is created to benefit the lawyer or another and causes the client serious or potentially serious injury. Disbarment is also recommended when the information obtained through the conflict is knowingly used to benefit the lawyer or another and causes serious or potentially serious injury to the client. *Id.* § 4.31(a)-(c), at 17-18.

**{64}** Disbarment is also appropriate when an attorney knowingly makes false statements to a court with the intent to deceive and causes a significant, or potentially significant, injury to a party or adverse effect on the legal proceeding. *Id.* § 6.11, at 22. Suspension, by contrast, is appropriate if the misrepresentation is knowingly made but not necessarily with the intent to deceive and causes injury, or potential injury, to the client or legal proceeding. *Id.* § 6.12, at 22. We note that for lack of diligence, negligence is enough for disbarment if the lawyer's neglect causes serious, or potentially serious, injury to a client. *Id.* § 4.41(c), at 18.

**{65}** This case presents several mitigating and aggravating factors. Most important, there was no evidence that dishonest or selfish motivations inspired Montoya's actions. *See id.* § 9.32(b), at 27 (absence of dishonest or selfish motives is a mitigating factor). There is some evidence that Montoya had sudden and significant health issues around the time of many of his infractions that affected his ability to handle his caseload. *See id.* § 9.32(h), at 28 (physical disability is a mitigating factor), § 9.32(c), at 27 (personal or emotional problems are mitigating factors). Prior to the violations described herein, Montoya had no disciplinary record. *Id.* § 9.32(a), at 27 (no prior record is mitigating factor). Yet, he committed all these infractions after practicing law since 1985, when he certainly should have known better. *See id.* § 9.22(i), at 27 (substantial experience in practice of law is an aggravating factor). In addition, in the state cases, Son was a vulnerable victim to Montoya's negligence. *See id.* § 9.22(h) (vulnerability of a victim is an aggravating factor). The number and variety of infractions is also an aggravating factor. *See id.* § 9.22(d) (multiple offenses is an aggravating factor).

**{66}** It is important to this Court that we apply discipline in a fair and consistent manner. Disciplinary counsel cited *In re Cooley*, No. 30,345 (May 18, 2007) (unpublished) as an example of a recent case in which this Court responded to similar infractions with discipline proportional to the discipline agreed upon in this case. Cooley admitted to a number of varied violations of the Rules of Professional Conduct, including violations regarding mismanagement of his trust account, including disbursements to himself without known purposes; counts of incompetent representation; engaging in conduct prejudicial to the administration of justice, including an outburst in court that interrupted a trial and confused a jury and a missed hearing scheduled by the court; and various other infractions.

**{67}** A settlement agreement with Cooley provided for a two-and-a-half-year suspension, with one year of actual suspension and the remainder deferred in favor of probation. Cooley

was required to abstain from alcohol and controlled substances during his probation and to undergo random alcohol and drug testing. Upon reinstatement, which would occur automatically if no conditions during suspension were violated, the agreement provided that Cooley would undergo an 18-month supervision period, during which he would continue random drug and alcohol testing and a monitoring agreement with the Lawyers Assistance Committee of the New Mexico State Bar.

**{68}** Like Montoya, Cooley had numerous and varied violations of the Rules of Professional Conduct of varying degrees of severity. Unlike Montoya, we hinged Cooley's reinstatement upon his successful abstention from alcohol and other drugs, among other things. Because we do not know whether Montoya's indiscretions are curable with time or treatment, and because his infractions are, on balance, more serious, we opted for a non-automatic reinstatement and a longer probationary period in his case.

**CONCLUSION**

**{69}** For the foregoing reasons, we accept the consolidated agreement of disciplinary action against Montoya, as amended.

**{70}** **IT IS SO ORDERED**.

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**EDWARD L. CHÁVEZ, Justice (recused)**

**Topic Index for *In re Dennis W. Montoya*, Docket No. 32,397**

| AT | ATTORNEYS |
|---|---|
| AT-AG | Attorneys, General |
| AT-CI | Conflict of Interest |
| AT-DA | Disciplinary Action |
| AT-PR | Professional Responsibility |
| AT-RU | Rule 11 Sanctions |
| AT-UP | Unauthorized Practice |

**CD**            **CHILDREN**
CD-CG       Children, General

**CP**            **CIVIL PROCEDURE**
CP-FV       Frivolous Complaint
CP-SA       Sanctions
CP-VN       Venue

**CR**            **CIVIL RIGHTS**
CR-AD       Age Discrimination

**DR**            **DOMESTIC RELATIONS**
DR-AD       Adoption
DR-CM       Common Law Marriage
DR-GI       Guardians ad Litem
DR-VM       Validity of Marriage

**JG**            **JUDGES**
JG         Judges, General
JG         Judicial Authority
JG-DS       Disqualification