IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2019-NMSC-006

Filing Date: January 17, 2019

Docket No. S-1-SC-37204

IN THE MATTER OF
ERIC D. DIXON

An Attorney Suspended from the
Practice of Law in the Courts of
the State of New Mexico

Jane Gagne
Albuquerque, NM

for Disciplinary Board

Gary C. Mitchell
Ruidoso, NM

for Respondent

## OPINION

**MAES, Justice.**

**{1}** This opinion follows disciplinary proceedings against attorney Eric D. Dixon. The Disciplinary Board found that Dixon, among other things, knowingly made false statements to the Ninth Judicial District Court and later to Disciplinary Counsel related to the representation of his client Jessica Aguilar (Jessica). The false statements began after the district court awarded summary judgment against Jessica on claim preclusion grounds, due to Dixon's prior voluntary dismissal with prejudice of a federal lawsuit that he had filed on behalf of "Jessie Aguilar." The Board concluded that Dixon violated Rule 16-101 NMRA (competence), Rule 16-301 NMRA (meritorious claims and contentions), Rule 16-303 NMRA (candor toward the tribunal), Rule 16-801 NMRA (bar admission and disciplinary matters), and Rule 16-804 NMRA (misconduct), and recommended that he be suspended from the practice of law for one year.

**{2}** We adopted the Board's findings and conclusions with one modification, which we explain later in this opinion. We indefinitely suspended Dixon from the practice of law for a period of no less than nine months, effective thirty days from November 9, 2018. We

1

further ordered that before filing a petition for reinstatement, Dixon must complete ten hours of ethics continuing legal education classes, with at least half of the credit earned for in-person classes, and must take and pass the Multistate Professional Responsibility Examination with a minimum scaled score of eighty. We ordered Dixon to pay the costs of his disciplinary proceedings and now issue this formal opinion.

{3}     We write to emphasize to the bench, bar, and public that a lawyer's duty of candor is clear and unequivocal: "Attorneys are officers of the court, and our system of justice works only if the courts can rely on attorneys to fulfill their duty of candor to the tribunal." *In re Chavez*, 2013-NMSC-008, ¶ 26, 299 P.3d 403. This case illustrates how easily a lawyer's decision to pursue a litigation strategy that is less than truthful can lead to multiple violations of the duty of candor, to the detriment of the legal system, the legal profession, and the public.

## I.    BACKGROUND

{4}     Dixon, who has been a sole practitioner since 1990 focusing on criminal defense and civil rights work, does not come before us with a clean slate. He was the subject of a public censure by this Court for an unrelated incident that occurred in 2011. *See In re Dixon*, S-1-SC-33713, *Bar Bulletin*, N.M. State Bar, Sept. 2, 2015, at 16 ¶ 2 (Public Censure filed Aug. 24, 2015). In that proceeding, several witnesses testified that they saw Dixon honk his horn and accelerate his car toward a Ninth Judicial District Court judge who was crossing the street. *Id.* Substantial evidence showed that Dixon "knew it was [the judge] who was crossing the street and purposefully drove his vehicle in a manner designed to frighten and harass him." *Id.* ¶ 4. In our public censure of Dixon, we observed that his conduct "strikes at the very core of our legal system's reliance on a professional, respectful relationship between the bench and bar to ensure the effective administration of justice." *Id.* ¶ 1. We admonished Dixon for "engag[ing] in threatening and unprofessional conduct," and we "caution[ed] him against engaging in such irresponsible and unprofessional behavior in the future." *Id.* ¶¶ 1, 10. Dixon's conduct that led to this proceeding, much of which occurred after his public censure, suggests that he did not heed our warning.

{5}     To understand the events that resulted in Dixon's suspension in this proceeding, one must ask, who is Jessie Aguilar? Dixon answered that question in an e-mail to opposing counsel on June 11, 2015: "There is no Jessie Aguilar[;] there is a Jessica Aguilar . . . ." That statement serves as the inflection point in this case. Before June 11, 2015, Dixon's conduct was, at best, extremely careless and sloppy[1]; afterwards, his conduct became

---

[1]Many of the events underlying this disciplinary proceeding are the subject of an appeal pending before the Court of Appeals. *See Aguilar v. Roosevelt Cty. Bd. of Cty. Comm'rs*, No. A-1-CA-36828. Our discussion and analysis of the facts set forth in this opinion are based on the findings and conclusions of the Board and are not intended to influence the outcome of the appeal.

increasingly deceptive until he made the false statements at issue in this proceeding. We explain, drawing from the Board's findings of fact and viewing the evidence in the light most favorable to those findings. *See In re Bristol*, 2006-NMSC-041, ¶ 28, 140 N.M. 317, 142 P.3d 905.

{6}     In October of 2013, Dixon entered into separate contingency fee agreements with Aguilar and nine male individuals. At about the same time, Dixon submitted tort claims notices to the Roosevelt County Clerk on behalf of Jessica and his nine male clients. The notice on Jessica's behalf pertained to an incident while she was an inmate at the Roosevelt County Detention Center (RCDC) in which she was allegedly "forced to endure a body cavity search against her wishes" by two unnamed female RCDC employees. The notices for Dixon's nine male clients alleged that, while they were inmates at the RCDC, they had been involved in "one or more of the pepper ball incidents" at the hands of Officer James Andes. Dixon did not enter into a contingency fee agreement with or file a tort claims notice on behalf of anyone specifically named Jessie Aguilar.

## A.     The Federal Lawsuit

{7}     Dixon filed a complaint in April of 2014 in the United States District Court for the District of New Mexico (the Federal Lawsuit). The complaint named Officer Andes and the Roosevelt County Board of County Commissioners as defendants and alleged that on September 26, 2013, Officer Andes had "fired at least five rounds of pepper balls" into a day room at the RCDC, injuring the inmates who were present. The caption of the complaint named ten individuals as plaintiffs: Dixon's nine male clients and a tenth person identified as "Jessie Aguilar." The body of the complaint alleged various civil rights violations and tort claims against the defendants and included specific allegations about only two of the plaintiffs, neither of whom was Jessie Aguilar.

{8}     In the early stages of the Federal Lawsuit, all indications were that Jessie Aguilar was a male inmate who had been present during the pepper ball incident alleged in the complaint. For example, Dixon used masculine pronouns to refer to Jessie Aguilar in Dixon's initial disclosures and in his portion of the joint status report filed with the court. Further, in October of 2014, Dixon filed a motion to amend the complaint that included a proposed first amended complaint (FAC). The court never gave leave to file the proposed FAC, which included new details about the alleged abuses and injuries suffered by four more of the plaintiffs. Like the original complaint, the proposed FAC mentioned Jessie Aguilar only in the case caption.

{9}     Beginning in November of 2014, clues about Jessie Aguilar's identity began to emerge as the Federal Lawsuit proceeded. On November 7, Dixon e-mailed opposing counsel that he had lost contact with five of his clients, including Jessie Aguilar. But later that month, Dixon's assistant faxed a release for Jessica's medical records—signed "Jessie Aguilar"—to opposing counsel. Similarly, in January of 2015, Dixon e-mailed opposing counsel a list of the plaintiffs' addresses, including the address of "Jessica Aguilar," and

3

stated that "Jessica Aguilar" was available for deposition "here locally."  And in February of 2015, Dixon's assistant instructed Jessica to answer interrogatories addressed to Jessie Aguilar, and Jessica's answers were served on opposing counsel.  The case caption on the certificate of service for the answers and on a few subsequent pleadings included the name "Jessica Aguilar" instead of "Jessie Aguilar."  The answers also included a verification signed by Jessica declaring under oath that she was a plaintiff in the Federal Lawsuit.  The answers described Jessica's injuries as "injury to eyes from the pepper ball spray; [and] depression due to possible PTSD," with no reference to injuries resulting from a body cavity search.

{10}     The Board made several findings relevant to this time period.  First, in late 2014 and early 2015 Dixon traveled extensively to Houston, Texas to assist his elderly parents.  Dixon's father succumbed to illness and died in February of 2015.  Further, no evidence was presented that Dixon knew that his assistant had faxed Jessica's medical release to opposing counsel.  Likewise, Dixon did not personally sign Jessica's interrogatory answers, and no evidence was presented that he had reviewed the answers before they were served on opposing counsel.  Dixon's assistant, who is related to Jessica by marriage, undertook those actions to help Dixon.  Additionally, Dixon's assistant changed "Jessie" to "Jessica" in the case caption on the certificate of service for the interrogatory answers, and Dixon likely copied and pasted the same caption into subsequent pleadings.

{11}     The Federal Lawsuit culminated in settlement negotiations in early 2015.  Dixon asserted Jessica's claims to opposing counsel as part of the negotiations, and the defendants offered to settle Jessica's claims for $1,000, which Jessica rejected.  Dixon then sent the June 11 e-mail described above, in which he informed opposing counsel, "There is no Jessie Aguilar[;] there is a Jessica Aguilar and her claim was not included in the complaint."  Dixon further stated,

> I will agree to dismiss Jessie Aguilar with prejudice with the understanding that I can bring a law-suit in the name of Jessica Aguilar.  She claims that her POD was shot with pepper balls around the same time.  She put on her contact lens which had film on them and burned her eyes.  In addition, she was taken to the public health department by two jail guards and had a pelvic exam done while both guards viewed the procedure which was very humiliating to her.

Opposing counsel refused to agree that dismissing Jessie Aguilar would not prejudice Jessica from filing a subsequent lawsuit in state court.  Nonetheless, on June 16, 2015, Dixon filed a notice of dismissal with prejudice "of all claims . . . that were brought or could have been brought by Jessie Aguilar."  No settlement monies were paid to Jessica as a result of the Federal Lawsuit.

**B.     The State Lawsuit**

4

**{12}** Ten days later, Dixon filed a complaint on Jessica's behalf in the Ninth Judicial District Court for Roosevelt County (the State Lawsuit). The complaint named as defendants the Roosevelt County Board of County Commissioners and "Jane Does I and II, in their official capacities as Detention Officers." The complaint alleged that Jessica was forced to undergo a pelvic exam without her consent "apparently to look for contraband." It further alleged that two female RCDC employees had remained in the room while a nurse performed the examination and asked Jessica personal and medical questions. The complaint sought unspecified damages for negligence, invasion of privacy, assault, and battery.

**{13}** On August 7, 2015, the defendants filed a motion for summary judgment on claim preclusion grounds, based on Dixon's dismissal with prejudice of Jessie Aguilar from the Federal Lawsuit. The district court granted the motion for summary judgment. Dixon later filed a motion to reconsider, which the district court denied. Dixon's litigation strategy in these proceedings led to his first knowingly false statement found by the Board.

**{14}** On August 24, 2015, the same day that we filed the public censure in Dixon's unrelated disciplinary proceeding, Dixon filed his response to the motion for summary judgment in the State Lawsuit. Instead of explaining the confusion in the Federal Lawsuit about the identity of Jessie Aguilar, Dixon stated that "Jesse Aguilar filed a claim in the United States District Court," and that "Jessica Aguilar[,] a female[,] and Jesse Aguilar, a male[,] are not the same person."[2] Dixon maintained that Jessica was never a party to the Federal Lawsuit, and he elaborated that "Jessica Aguilar has never been known as Jesse Aguilar . . . ." The Board did not find clear and convincing evidence that these representations were intentionally misleading. But we observe that at the very least, these representations were evasive and inconsistent with Dixon's earlier admission that "[t]here is no Jessie Aguilar[;] there is a Jessica Aguilar."

**{15}** Dixon crossed the line separating truth from falsehood in a later filing in support of his motion to reconsider the district court's award of summary judgment against Jessica. Arguing again that Jessica's claims were not part of the Federal Lawsuit, Dixon asserted that "counsel always intended to file a law-suit for Jessica Aguilar *and in fact filed a Motion to Amend the Complaint filed in Federal Court to bring Jessica Aguilar into the law-suit*."

---

[2]We find no reference in the Federal Lawsuit to a "Jesse" Aguilar, arguably a third Aguilar in this proceeding. That spelling first occurred in Dixon's response to the motion for summary judgment, which included an affidavit in which Jessica stated under penalty of perjury, "I have never been referred to as Jesse Aguilar." Dixon relied on Jessica's statement to argue that "Jesse" and Jessica are not the same person and that "Jessica Aguilar has never been known as Jesse Aguilar." We adopted the hearing committee's finding that Dixon was unaware that Jessica had ever been known as Jessie. However, we view the timing and circumstances of Dixon's use of the name "Jesse" as highly suspicious and likely intended to evade the truth and confuse this matter even further.

5

(Emphasis added.) That assertion was provably false. Neither the motion to amend nor the proposed FAC in the Federal Lawsuit sought to add Jessica as a plaintiff, to add her name to the case caption, to add allegations about an alleged body cavity search, or to join the two unnamed RCDC employees as defendants. The Board later found clear and convincing evidence that Dixon "never intended for the Proposed FAC to bring [Jessica] Aguilar into the Federal Lawsuit" and that his statement to the contrary was intentionally misleading. The district court denied Dixon's motion to reconsider, and Jessica's appeal in the State Lawsuit is pending in the Court of Appeals at the time of the writing of this opinion.

## C.    The Disciplinary Proceedings

**{16}**    Counsel for Roosevelt County later filed a complaint with the Board related to Dixon's conduct in the Federal and State Lawsuits. Disciplinary Counsel initiated an investigation and eventually filed a specification of charges against Dixon. Dixon's deceptive behavior continued in the disciplinary proceedings.

**{17}**    In response to Disciplinary Counsel's initial inquiry, Dixon wrote a letter describing his version of events in the Federal Lawsuit. Dixon continued to represent that he had filed the Federal Lawsuit on behalf of Jessie Aguilar, one of ten individuals who was "incarcerated at the [RCDC] in Portales, New Mexico" and "who had been pepper-ball sprayed at the [RCDC]." Explaining that the defendants had taken the depositions of five of the plaintiffs, Dixon asserted, "Neither the deposition of Jesse Aguilar or Jessica Aguilar was ever notice[d] or requested."[3] Once again, that statement was provably false. Counsel for the defendants in the Federal Lawsuit electronically served on Dixon via e-mail a notice of deposition for Jessie Aguilar on January 20, 2015. The Board later found that Dixon had constructive notice, if not actual notice, that Jessie Aguilar's deposition had been "noticed" when Dixon stated to the contrary to Disciplinary Counsel.

**{18}**    Dixon also introduced in the disciplinary proceedings a novel explanation for including Jessie Aguilar in the Federal Lawsuit, an explanation the Board found "not credible." Dixon testified in his deposition that he had named Jessie Aguilar as a plaintiff based on a discussion with Roy Montano, one of the other plaintiffs in the Federal Lawsuit.

> [T]here is an extended family that I've represented for many years, Roy Montano—Montano is the uncle of Jessica Aguilar. And when I spoke to Mr. Montano, my recollection was that he said he had a nephew by the name of Jesse Aguilar that had been pepper-ball sprayed.

---

[3]We again note Dixon's troubling use of the name "Jesse" Aguilar. We adopted the Board's findings that treated Dixon's use of "Jesse" as a mistake or typographical error. We emphasize, however, that the timing and circumstances of Dixon's use of "Jesse," for example when denying receipt of a notice of deposition for "Jesse" Aguilar, suggest an intentional effort to mislead the Board and this Court.

6

Dixon further testified that he had included Jessie Aguilar in the Federal Lawsuit, despite the absence of a contingency fee agreement, because he had represented Montano before and trusted him. In finding that Dixon's explanation was "not credible," the Board specifically noted that Dixon had never mentioned the alleged conversation with Montano until after Montano's death in May of 2017, despite "numerous opportunities, including in these proceedings, [when] it would have been to [Dixon's] advantage to raise the matter of Roy Montano telling him about a nephew, Jessie Aguilar."

## II.    DISCUSSION

**{19}**    The Board concluded that Dixon violated Rules 16-101, -301, -303, -801, and -804. We review the Board's conclusions of law de novo. *See In re Bristol*, 2006-NMSC-041, ¶¶ 18, 26.

## A.    Duty of Candor

**{20}**    "[T]he integrity of the adjudicative process requires that a lawyer act truthfully and honestly before the court." *In re Montoya*, 2011-NMSC-042, ¶ 33, 150 N.M. 731, 266 P.3d 11 (per curiam). Indeed, the duty of candor applies to every facet of a lawyer's professional responsibilities. *See, e.g.*, Rule 16-303 (setting forth a lawyer's duties of candor toward the tribunal); Rule 16-401(A) NMRA (providing that a lawyer shall not knowingly make a false statement of fact to a person who is not a client); Rule 16-701 NMRA ("A lawyer shall not make, elicit, or endorse a false or misleading communication about the lawyer or the lawyer's services."); Rule 16-801 (providing that a lawyer shall not knowingly make a false statement of fact "in connection with a bar admission application or in connection with a disciplinary matter"); Rule 16-804(C) (defining professional misconduct for a lawyer, in part, as "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"). Dixon's false statements in this proceeding violated Dixon's duty of candor under several of these rules.

**{21}**    As a threshold matter, we pause to address Dixon's argument that the Board's reliance on the statements described in this opinion as a basis for discipline violated his due process rights to notice and an opportunity to respond. Dixon essentially argues that the Board performed a bait-and-switch because the specification of charges alleged only that he knew that Jessie Aguilar and Jessica were the same person and that he therefore improperly filed the State Lawsuit after he had filed and dismissed the Federal Lawsuit on Jessica's behalf. Dixon argues that the Board rejected Disciplinary Counsel's theory of misconduct and substituted its own theory without giving him notice and an opportunity to defend himself. *See, e.g.*, *Mills v. N.M. State Bd. of Psychologist Exam'rs*, 1997-NMSC-028, ¶ 14, 123 N.M. 421, 941 P.2d 502 ("Procedural due process requires notice and an opportunity to be heard prior to a deprivation of a protected liberty or property interest.").

**{22}**    Dixon's argument lacks merit. The specification of charges provided notice that Dixon's conduct in the Federal and State Lawsuits was under scrutiny, including whether

he had been truthful in the summary judgment proceedings in the State Lawsuit and in the disciplinary proceedings. Dixon hired counsel and vigorously contested the allegations against him at each level of the proceedings, including before this Court. We see no lack of due process under these circumstances. *See id.* ("The specific requirements of procedural due process . . . could encompass any number of the following components: (1) notice of the basis for the government action; (2) a neutral decision maker; (3) the opportunity to orally present a case against the state; (4) the opportunity to present evidence and witnesses against the state; (5) the opportunity to cross-examine witnesses; (6) the right to have an attorney present at the hearing; and (7) a decision based on the evidence presented at the hearing accompanied by an explanation of the decision.").

## 1.    Candor toward the tribunal

**{23}**    Rule 16-303(A)(1) prohibits a lawyer from "knowingly . . . mak[ing] a false statement of fact . . . to a tribunal." Dixon violated Rule 16-303(A)(1) by knowingly and falsely representing to the Ninth Judicial District Court that he had "filed a Motion to Amend the Complaint filed in Federal Court to bring Jessica Aguilar into the law-suit." Dixon, as the author of the motion to amend and of the proposed FAC, knew that neither document mentioned Jessica or purported to provide any factual or legal support for her claims beyond what may (or may not) have been included in the original complaint. We therefore agree with the Board that there was clear and convincing evidence that "Dixon intentionally misled the court in the State Lawsuit" with that representation and that Dixon "never intended for the Proposed FAC to bring Jessica Aguilar into the Federal Lawsuit."

**{24}**    Dixon takes issue with the Board's reliance on "one sentence" out of "[t]housands of pages of documents [that] were generated in the case" to support a violation of Rule 16-303(A)(1). That argument ignores the context in which Dixon made the false statement. Dixon's "one sentence" resulted from a litigation strategy in the State Lawsuit that needlessly clouded the truth about what had occurred in the Federal Lawsuit. Rather than acknowledging and explaining the confusion that he had created, Dixon advanced a narrative that he had filed the Federal Lawsuit on behalf of a male Jessie Aguilar who was present during the alleged pepper ball incident at RCDC. But as Dixon himself had previously explained, "There is no Jessie Aguilar." And as the Board found, "No male by the name of Jessie, Jesse or Jessy Aguilar or any other spelling of that name was housed at the RCDC on September 30, 2013." Additionally, Dixon never came forward in these proceedings with a credible explanation for naming a male Jessie Aguilar in the Federal Lawsuit. Nonetheless, Dixon pushed harder and harder on that tenuous narrative until he knowingly made a statement that was demonstrably false. Under these circumstances, Dixon's complaint that the Board plucked a single statement out of context to support a violation of Rule 16-303(A)(1) rings hollow.

## 2.    Candor in disciplinary proceedings

**{25}**    Dixon also violated Rule 16-801(A), which prohibits a lawyer from knowingly

8

making a false statement of material fact in connection with a disciplinary proceeding. Dixon falsely stated to Disciplinary Counsel that opposing counsel in the Federal Lawsuit had not given notice of or requested the deposition of "Jesse" Aguilar. Dixon's statement flowed from the same strategy that he had employed in the district court, which once again resulted in a knowing falsehood. We agree with the Board that Dixon's statement was false and that he had constructive notice, if not actual notice, of its falsity at the time that he made it. Further, we note that the Board found that Dixon's explanation for including Jessie Aguilar in the Federal Lawsuit based on a conversation with Montano was not credible "given the totality of circumstances of this case." That finding, which is supported by substantial evidence, is tantamount to a determination that Dixon fabricated his story about Montano telling him that Montano's non-existent nephew, Jessie Aguilar, was present during the pepper ball incident. Substantial evidence supports the Board's conclusion that Dixon violated Rule 16-801(A).

### 3. Professional misconduct

**{26}** These knowingly false statements, made in multiple settings and over an extended period of time, violated Rule 16-804. Dixon's actions in the State Lawsuit and in this disciplinary proceeding amounted to conduct involving dishonesty, deceit, and misrepresentation. *See* Rule 16-804(C). In addition to the harms caused by the knowingly false statements themselves, this case illustrates the pernicious nature of statements that fall just short of that threshold. Dixon's repeated dissembling and splitting of hairs in the State Lawsuit and in the disciplinary proceedings about Jessie Aguilar's identity led to his false statements in both proceedings. Had Dixon simply acknowledged and explained the confusion in the Federal Lawsuit, he would have avoided much of the trouble that has followed.

**{27}** Due to Dixon's lack of candor throughout these proceedings, we may never know why "Jessie Aguilar" was named in the Federal Lawsuit. The lack of certainty is intolerable. It already has delayed Jessica's state law claims and ultimately may preclude them altogether, depending on the outcome of her appeal. Dixon therefore has committed misconduct prejudicial to the administration of justice. *See In re Montoya*, 2011-NMSC-042, ¶ 23 ("[A] failure of candor to the court can prejudice the administration of justice in violation of Rule 16-804(D) NMRA.").

### B. Competence

**{28}** The mandate of Rule 16-101 is unequivocal: "A lawyer shall provide competent representation to a client." Dixon failed to provide competent representation to Jessica in the Federal Lawsuit by treating her as though she was the same person as the plaintiff Jessie Aguilar. It is equally clear that Dixon never entered into a contingency fee agreement with or filed a tort claims notice on behalf of Jessie Aguilar. As previously discussed, it remains impossible to tell who the Jessie Aguilar named in the Federal Lawsuit actually was. However, there is no doubt that before the Federal Lawsuit was filed, Dixon had agreed to

9

represent Jessica for her claims arising from the events described in her tort claims notice.

**{29}**   Dixon's filing of the Federal Lawsuit on behalf of "Jessie Aguilar" therefore placed Jessica's claims on precarious footing.  That is especially true given the similarities of Jessica's claims and the allegations in the Federal Lawsuit, which (1) named one of the same defendants implicated by Jessica's tort claims notice; (2) arose from events that occurred at about the same time and location as the events described in Jessica's tort claims notice; and (3) did not offer any specific allegations to distinguish Jessie Aguilar's factual or legal claims from Jessica's.  The potential for confusion with Jessica's claims under these circumstances should have been manifest to a competent attorney.

**{30}**   Dixon further jeopardized Jessica's claims when, in the Federal Lawsuit, he (1) asserted Jessica's claims to opposing counsel during settlement negotiations; (2) attempted to negotiate a settlement on Jessica's behalf when opposing counsel knew that the defendants were making an offer to Jessica of $1,000, which Jessica rejected; (3) sought agreement from the defendants—which they refused—that dismissing "Jessie Aguilar" would not prejudice Jessica from filing a subsequent lawsuit in state court; and (4) voluntarily dismissed the claims of "Jessie Aguilar" with prejudice and without any monies paid to Jessica.  A competent attorney would have realized that dismissing the claims of "Jessie Aguilar" with prejudice under these circumstances would imperil a subsequent lawsuit on Jessica's behalf related to the events described in her tort claims notice.  Dixon failed to provide competent representation to Jessica.

**{31}**   In our order indefinitely suspending Dixon, we rejected the Board's second basis for a violation of Rule 16-101 because it was not supported by substantial evidence. *See* Order, *In re Dixon*, No. S-1-SC-37204 (N.M. Sup. Ct. Nov. 9, 2018). The Board concluded that Dixon failed to provide competent representation to Jessie Aguilar "as evidenced by bringing suit on his behalf without ever speaking with him, and then by dismissing his claims with prejudice without first consulting him."  That conclusion is inconsistent with the overriding theme of the Board's findings and conclusions that Dixon never represented a male Jessie Aguilar because a male Jessie Aguilar never existed in connection with the allegations in the Federal Lawsuit.  We therefore reject that portion of the Board's conclusion related to Dixon's violation of Rule 16-101. *See* Rule 17-316(D)(1) NMRA ("The Supreme Court . . . may . . . reject any or all of the findings, conclusions or recommendations of the Disciplinary Board.").

## C.   Meritorious claims and contentions

**{32}**   Rule 16-301 provides in pertinent part, "A lawyer shall not bring or defend a proceeding . . . unless there is a basis in law and fact for doing so that is not frivolous . . . ." We agree with the Board that Dixon violated Rule 16-301 by filing frivolous claims on behalf of Jessie Aguilar in the Federal Lawsuit, an (apparently fictitious) individual with whom Dixon never spoke "before filing suit and who was not even incarcerated at RCDC on the date in question."  The Board found that "Dixon never met or spoke with Jessie

10

Aguilar about the Civil Complaint filed on his behalf, and was never asked by Jessie Aguilar to represent him in connection with claims asserted on his behalf in the Federal Lawsuit." The Board also found that "[n]o male by the name of Jessie, Jesse or Jessy Aguilar or any other spelling of that name was housed at the RCDC on September 30, 2013." And the Board found that Dixon's sole explanation for naming a male Jessie Aguilar in the Federal Lawsuit was not credible. Dixon therefore lacked any basis in law and fact for filing claims on behalf of a male Jessie Aguilar.

**{33}** We agree with Dixon, however, that one of the Board's findings in support of this violation was contrary to law. The Board found that Dixon lacked a good faith basis, in particular, for Jessie Aguilar's state law claims at least in part because "no notice was ever provided on behalf of Jessie Aguilar in accordance with the New Mexico Tort Claims Act." Dixon rightly asserts that the lack of formal, written notice is not determinative of the validity of a claim under the Tort Claims Act. We have interpreted the notice provision of the Tort Claims Act as setting forth a functional standard, requiring consideration of the totality of the circumstances known to the governmental entity and "whether . . . a reasonable person would have concluded that the victim may claim compensation." *See, e.g.*, *Lopez v. State*, 1996-NMSC-071, ¶ 12, 122 N.M. 611, 930 P.2d 146 (discussing NMSA 1978, § 41-4-16 (1977)). In this case, Roosevelt County may have received "actual notice" of the pepper ball incident alleged in the Federal Lawsuit, and therefore, "whether the facts give rise to a reasonable inference that a claim may be filed is a threshold inquiry to be resolved by the court." *Id.* ¶ 16. We therefore reject this finding. *See* Rule 17-316(D)(1).

## III.    DISCIPLINE

**{34}** We indefinitely suspended Dixon from the practice of law for a period of no less than nine months. We consider an indefinite suspension to be an appropriate sanction for Dixon due not only to the intentional, harmful nature of his conduct in this proceeding, but also to his prior discipline. *See* Am. Bar Ass'n, *Annotated Standards for Imposing Lawyer Sanctions* (*ABA Annotated Standards*), Standard 8.2 (2015) ("Suspension is generally appropriate when a lawyer has been reprimanded for the same or similar misconduct and engages in further similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession."). In Dixon's public censure, we admonished him for engaging in conduct that "erodes the foundation of our legal system and undermines its reputation in the eyes of the public." *In re Dixon*, No. S-1-SC-33713, ¶ 9. We further stated, "Without an unwavering public demonstration of trust and respect between the members of the bench and the bar, we cannot expect the public to trust and respect us." *Id.*

**{35}** Dixon's conduct in this proceeding raises similar concerns. A lawyer who makes false statements, tells half-truths, and otherwise attempts to mislead harms the legal system and the legal profession. The essential aim of our legal system is to seek truth in the pursuit of justice; for a lawyer, all other duties and responsibilities are secondary. *See ABA Annotated Standards* 6.11 annot. ("A lawyer who engages in deceptive conduct in legal proceedings violates the most fundamental duty of an officer of the court."). Thus, a lawyer

11

who subordinates truth to obtaining a successful outcome for a client or to avoiding personal responsibility undermines the rule of law and erodes public trust and confidence in the legal system. We must demand better from each other. Dixon's suspension serves as a reminder of the importance of a lawyer's duty of candor.

**{36}** We are unmoved by the mitigating factors found by the Board. We acknowledge that Dixon faced significant hardships during the Federal Lawsuit, including his parents' failing health and an unconstitutional visitation policy at the RCDC. While those challenges may have influenced Dixon's performance in the Federal Lawsuit, they do not diminish his responsibility for his lack of candor, which is our primary concern. That is especially true given Dixon's considerable experience practicing law and his refusal to acknowledge the full extent of the seriousness of his conduct. *See ABA Annotated Standards* 9.22 (listing aggravating factors including prior disciplinary offenses, dishonest motive, multiple offenses, deceptive practices during the disciplinary process, and substantial experience in the practice of law). We therefore conclude that an indefinite suspension is warranted.

**{37}** Dixon's indefinite suspension will require him to petition the Board for reinstatement and to come before this Court again before he can resume the practice of law. *See* Rule 17-214(B)(2) NMRA. If Dixon satisfies the conditions for reinstatement and chooses to petition for reinstatement, he will have the burden of demonstrating by clear and convincing evidence the following: (1) that he "has the moral qualifications to practice law"; (2) that he "is once again fit to resume the practice of law"; and (3) "that the resumption of [his] practice of law will not be detrimental to the integrity and standing of the bar, the administration of justice, or the public interest." Rule 17-214(E). In light of the serious concerns raised by Dixon's conduct in this proceeding and described in his public censure, we encourage Dixon to take each of these elements seriously before he chooses to seek reinstatement. *See* Rule 17-214(B)(2) (providing that if the Supreme Court denies a petition for reinstatement, the lawyer may not petition again for reinstatement "prior to the expiration of a twelve (12) month period").

## IV. CONCLUSION

**{38}** We adopt the Board's findings of fact and conclusions of law as modified in our order dated November 9, 2018 and in this opinion. We indefinitely suspend Dixon from the practice of law for a period of no less than nine months, subject to the conditions stated earlier in this opinion, and we order him to pay the costs of this proceeding as provided in our November 9, 2018 order.

**{39}** **IT IS SO ORDERED.**

                                         _____

                                         **PETRA JIMENEZ MAES, Justice, retired**
                                         **Sitting by designation**

**WE CONCUR:**

_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**BARBARA J. VIGIL, Justice**

_____
**CHARLES W. DANIELS, Justice, retired**
**Sitting by designation**

_____
**GARY L. CLINGMAN, Justice, retired**
**Sitting by designation**